NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————
|                                                      | x |                                        |
|------------------------------------------------------|---|----------------------------------------|
| KURT H. EICHORN, et al.,                             | x |                                        |
|                                                      | x | Hon. Stanley R. Chesler, U.S.D.J.      |
| plaintiffs,                                          | x |                                        |
|                                                      | x | Civ. No. 96-3587                       |
| v.                                                   | x |                                        |
|                                                      | x | **OPINION**                            |
| AT&T CORP.; LUCENT TECHS.                            | x |                                        |
| INC.; TEXAS PACIFIC GROUP;                           | x |                                        |
| NCR CORP.; THE CIT GROUP,                            | x |                                        |
| INC.; AND "JOHN DOE" CORPS. 1-10,                    | x |                                        |
|                                                      | x |                                        |
| defendants.                                          | x |                                        |
———————————————————————

**CHESLER, District Judge**

  This matter comes before the Court on a motion by the defendant Texas Pacific Group

("TPG"), pursuant to Rule 56, for summary judgment against the plaintiffs.  [Docket Entry Nos.

173 & 174.]  Defendants Lucent Technologies, Inc. ("Lucent"), AT&T Corporation ("AT&T"),

and NCR Corporation ("NCR") join in TPG's motion.  In this action, plaintiffs seek relief against

the defendants under the Employees Retirement Income Security Act ("ERISA") for allegedly

foreclosing certain retirement benefits to which they were entitled.  Plaintiffs invoke Section 510

of ERISA, 29 U.S.C. § 1140, through its remedial mechanisms, Section 502(a)(1)(B), 29 U.S.C.

§ 1132(a)(1)(B) and Section 502(a)(3), 29 U.S.C. § 1132(a)(3).[1]  For the reasons set forth below,

defendants' motion is granted.

———————

  [1]The Court will refer to these provisions as Section 510, Section 502(a)(1)(B), and
Section 502(a)(3), respectively.

I.    **FACTS**

    A.    **Factual Background**

This case involves AT&T's sale of a subsidiary, Paradyne Corporation ("Paradyne"), and the effect of that sale on the retirement benefits of the plaintiffs, Paradyne employees.

In 1989, AT&T acquired Paradyne, a maker of telecommunications network access products, and operated it as a wholly-owned subsidiary.  Paradyne's employees were covered by a pension plan established by AT&T and adopted by its affiliates (the "AT&T Plan").  (Final Pretrial Order ("FPO") at 8, ¶ 13.)  Plaintiffs contend that the AT&T Plan allowed an employee who left one AT&T company and, within six months, was re-employed by another AT&T company, to receive credit for all prior service and, as a vested pension plan participant, to immediately begin to accrue additional pension benefits.  (Id.)  Plaintiffs further contend that if re-employment were to occur after a break in AT&T service of more than six months, the employee would have to remain employed for an additional five years to bridge the two terms of employment for pension purposes.  (Id.)

On October 18, 1995, AT&T announced its intent to sell Paradyne.  (Id. at 6, ¶ 6.)  Plaintiffs contend that, to make Paradyne more attractive to buyers, AT&T adopted a policy, known as the "Preliminary Net," that prohibited Paradyne employees from transferring to other jobs within the AT&T companies.  (Id. at 6, ¶ 6.)  Plaintiffs maintain that the reason for the hiring bar was AT&T's belief that one of Paradyne's most marketable assets was its skilled employees and retention of those employees was considered essential for the sale of Paradyne.  (Id. at 8, ¶ 15-16.)  Plaintiffs further contend that retaining Paradyne employees further served the defendants' interests of maintaining its viability as a supplier of telecommunications equipment

2

to AT&T and its affiliates.  (Id. at 7, ¶ 11-12.)

In November of 1995, AT&T reorganized, resulting in the creation of three separate companies:  AT&T, Lucent, and NCR.  (FPO at 5, ¶ 6.)  This reorganization is known as the "AT&T Trivestiture."  As part of the AT&T Trivestiture, AT&T transferred Paradyne to Lucent. (FPO at 5, ¶ 2.)  Pursuant to the Preliminary Net, Paradyne employees remained precluded from seeking employment at other AT&T companies.

TPG became interested in acquiring Paradyne from Lucent and, in April of 1996, began negotiating its purchase.  (Id. at 6, ¶ 3; 8, ¶ 14.)  Negotiations culminated in the June 18, 1996 Purchase Agreement between TPG and Lucent.  (Id. at 8, ¶ 14.)  The Purchase Agreement included a further hiring restriction that prohibited AT&T, Lucent, and their respective affiliates from hiring anyone who had been employed at Paradyne since June 1, 1996 and whose compensation was greater than $50,000.  (Id. at 8, ¶ 16; Certification of David Michael Fabian ("Fabian Cert."), Ex. A at ¶ 4.5 therein.)  This prohibition is referred to as the "Pre-Closing Net." On June 19, 1996, Paradyne employees were advised of the sale and, further, that their retirement benefits under the AT&T Plan would be discontinued.  (FPO at 8, ¶ 16.)  In effect, the Pre-Closing Net extended the prohibition on Paradyne employees' ability to transfer employment to AT&T affiliates.

The Paradyne deal closed on July 31, 1996.  (Id. at 8, ¶14.)  At the closing, parties to the transfer executed the "Employee Matters Agreement," which extended the Pre-Closing Net for eight months after the closing.  (Id. at 8, ¶ 18.)  Plaintiffs claim that the Preliminary Net, the Pre-Closing Net, and the Employee Matters Agreement (collectively the "Nets") guaranteed that they could not enjoy the AT&T Plan's benefit of bridging their accrued retirement credit by becoming

3

re-employed by another AT&T company within six months.  (Id. at 8, ¶ 25.)  Plaintiffs claim that

this interfered with accrual of their retirement benefits solely for the purpose of increasing the

defendants' profits.  (Id. at 8, ¶ 19.)

### B.    Procedural History

As a result of these events, plaintiffs filed a number of cases that resulted in the instant

consolidated matter, Eichorn v. AT&T Corp., 96-3587 (hereinafter "Eichorn").[2]  Plaintiffs

alleged that the Nets violated Section 1 of the Sherman Act and had the effect of "interfering

with the attainment of" certain rights with respect to plaintiffs' benefits in violation of ERISA

---

[2]Eichorn was filed on July 24, 1996 by a putative class action of Paradyne employees
against AT&T, Lucent, and TPG.  The second action, Daly v. AT&T Corp., 96-4674 (MLC)
(hereinafter "Daly"), was filed on October 3, 1996 and, on November 20, 1996, was consolidated
with Eichorn.  By order dated March 29, 1999, the Honorable Mary L. Cooper granted summary
judgment to the defendants in those actions dismissing plaintiffs' antitrust claims.  [Docket Entry
No. 42.]  By order dated August 23, 1999, Judge Cooper denied plaintiffs' application for class
discovery and dismissed plaintiffs' ERISA claims.  [Docket Entry No. 48.]  Plaintiffs appealed
Judge Cooper's decisions.

While Eichorn was on appeal, plaintiffs' counsel filed Lawless v. AT&T Corp., 00-0081
(hereinafter "Lawless") and Brugner v. AT&T Corp., 00-3008 (hereinafter "Brugner").  The
claims in Lawless and Brugner arose from the same facts as Eichorn and differed only insofar as
they were not putative class actions, and they named NCR and CIT as defendants.

The Court of Appeals for the Third Circuit affirmed Judge Cooper's decision with respect
to plaintiffs' antitrust claims, but reversed her ruling with respect to the ERISA claims.  Eichorn
v. AT&T Corp., 248 F.3d 131, 150 (3d Cir. 2001) (holding "plaintiffs have presented sufficient
circumstantial evidence of intent to interfere with their pension rights to create a genuine issue of
material fact.").  The Court of Appeals for the Third Circuit did not address whether or not the
relief that plaintiffs sought was recoverable under Section 502 of ERISA.  For this reason, the
instant motion does not seek to overturn what is now law of the case, as plaintiffs argue.  (See
Pl.'s Br. at 2-3.)

Accordingly, plaintiffs' ERISA claims were remanded to this Court with the direction
that the District Court address plaintiffs' motion for class discovery.  Eichorn, 248 F.3d at 150.
On August 28, 2001, Lawless and Brugner were consolidated with Eichorn.  [Docket Entry No.
66.]  The case was reassigned to the Undersigned on December 20, 2002.  [Docket Entry No. 95.]

Section 510.  [Docket Entry No. 1.]  Only the ERISA claims remain.

On December 12, 2003, TPG filed a motion to strike testimony and related calculations of plaintiffs' damages witness, Stephen A. Crowley, and to enter summary judgment in defendants' favor.  [Docket Entry No. 149.]  On August 18, 2004, the Court granted defendants' motion to strike plaintiffs' damages witness and requested supplemental briefing on whether or not plaintiffs should be permitted to make additional damages submissions.  [Docket Entry No. 156.] On November 10, 2004, after supplemental briefing, the Court entered an Order that (1) barred plaintiffs from submitting Mr. Crowley's calculations, reports, and testimony; (2) denied plaintiffs leave to add expert witnesses or submit calculations, reports, or testimony of such witnesses; (3) denied defendants' motion for summary judgment; (4) expressly reserved on the issue of "whether plaintiffs can quantify or establish any right to 'back pay' and/or equitable relief increasing plaintiff's pension benefits"; and (5) directed the parties to confer with Magistrate Judge Hughes to schedule discovery on remaining damages issues.  [Docket Entry No. 163.]

Defendants filed the instant motion on May 19, 2005.  [Docket Entry Nos. 173 & 174.] In their motion, the defendants generally argue that ERISA Section 502(a) does not allow recovery for plaintiffs' claims.  (See Def.'s Br. at 4-13.)  Defendants argue that plaintiffs' only possible theories of recovery are under Sections 502(a)(1)(B) and Section 502(a)(3).  (Id. at 5-7.) Defendants argue plaintiffs cannot recover under Sections 502(a)(1)(B) because they allege that the defendants interfered with their ability to obtain rights under the AT&T Plan, not the breach of the Plan provision, which is the sole conduct for which that section provides a remedy.  (Id. at 7.)  Defendants further argue the compensatory damages that plaintiffs seek are not "appropriate

equitable relief" under Sections 502(a)(3).  To address these arguments, the Court must analyze the alleged conduct at issue and the nature of plaintiffs' claimed damages.

## C.      Defendants' Alleged Conduct

Plaintiffs do not seek recovery for a breach of the AT&T Plan, but for interference with benefits to which they would have been entitled had they remained subject to the AT&T Plan. Specifically, plaintiffs claim that the purpose of the Nets was to "thwart the predictable efforts of Paradyne employees to find employment with other units of the former AT&T organization, thereby preventing them from remaining as vested participants in an ongoing pension plan with the right to add more service time to their existing pension credits."  (FPO at 9, ¶ 22.)  Plaintiffs claim that the Nets had the effect of "preventing the Paradyne workers from attaining or enjoying the benefits of the pension-bridging provisions to which they are entitled as pension plan participants."  (Id. at 13, ¶ 46.)  In their motion papers, plaintiffs state that the Nets "impede[d] their continued participation in the AT&T/Lucent pension plan," and that "such action constituted interference with the attainment of an ERISA-protected right."  (Pl.'s Br. at 2.)

## D.      Plaintiffs' Alleged Damages

On June 27, 2005, United States Magistrate Judge John J. Hughes entered the Final Pretrial Order in this case.  [Docket Entry No. 194.]  Item 6.B.[3] of the Final Pretrial Order states that plaintiffs will call 25 former Paradyne employees and "[a]ll such testimony will correspond closely to information provided in depositions and responses to written discovery requests, the

---

[3]Part 4.B. of the Final Pretrial Order requires plaintiffs to list each contested fact they intend to prove with respect to damages, including "each item of damages, the amount of each item, [and] the factual basis for each item . . . ."  (FPO at 13, Part 4.B.)  In response to this, plaintiffs state "the factual showing as regards to damages is set forth in Section 6.B. below." (Id.)

answers to interrogatories propounded by defendants . . . near the end of 2004 in particular." (Id. at 30.)  The answers to interrogatories to which plaintiffs refer are attached to Mr. Fabian's certification as Exhibits H through DD.  The relevant interrogatory, number 5, asked plaintiffs to "[i]dentify all damages you claim as a result of the allegations contained in the Complaint, which have not been precluded by the Court's November 10, 2004 Order and set forth fully and comprehensively the method of computation used to reach the damage figures."  (See, e.g., Fabian Cert., Ex. H at 5.)  Plaintiffs' interrogatory answers reflect calculations, pursuant to various formulae[4], of money they would have received but for the defendants' alleged interference.  By way of example, in her March 20, 2005 response to the damages interrogatories, plaintiff Judith B. Brugner set forth the calculation by which she claimed that her damages amount to $298,252.57.  (Id., Ex. H at 6-7.)  Ms. Brunger stated:

> I base these damage calculations on taking retirement on January 15, 2000 after reaching 20 years' service to qualify for an unreduced service pension under the Transition Benefit Formula which is applicable to employees who became eligible for retirement during the period from January 1, 1997 to December 31, 2000, and is based on earnings from 1991 through 1996.

(Id., Ex. H at 6-7.)  After applying the proposed formula, Ms. Brunger concluded:

> The combination of the accrued pension payments with interest thereon that I should have received through April 30, 2005 ($128,290.35) plus my additional damages for lost pension benefits

---

[4]The calculations involve an application of different formulae that the plaintiffs claim apply to the AT&T Plan, including the "Transition Formula" (see Fabian Cert., Ex. H at 5-7; Ex. I at 4-6; Ex. Q at 4-7; and Ex. R at 5-7), the "Lucent Retirement Income Plan Service Program Summary Plan Description effective 1/1/2000, updated 11/20/2000" (see id., Ex. J at 15-16; Ex. K at 5; Ex. L at 5-6; Ex. M at 4-5; Ex. P at 6-9; Ex. U at 6-8; Ex. W at 5-6; and Ex. Y at 4-7), and the like (see id., Ex. N at 4-5; Ex. O at 4-5; Ex. S at 4-6; Ex. T at 4-6; Ex V at 4-7; Ex. X at 5-7; Ex. Z at 5-7; Ex. AA at 4-6; Ex. BB at 4-5; and Ex. CC at 5-7.).  The details of these formulae are not relevant to this opinion.

> subsequent to that date as determined by the cost of an annuity
> ($169,962.22) results in total damages of $229,252.57.

(Id., Ex. H at 7.)  The interrogatory responses do not state that the plaintiffs seek equitable relief,

but rather frame the plaintiffs' damages solely in terms of a monetary amount.

Plaintiffs' legal theories, referred to in part 13 of the Final Pretrial Order, preserved the

following legal issues:

> 3       Should Lucent and/or AT&T be compelled in the exercise
> of the Court's equitable jurisdiction to adjust plaintiffs' existing
> pension rights by crediting them with the service time they failed to
> accrue as a result of the no-hire agreement?
>
> 4.      Have plaintiffs correctly calculated the monetary values of
> the pension benefits lost through interference with their ability to
> continue holding pension-bearing employment up to the present
> time, or such sooner time as would have qualified them to receive
> pension benefits?

(FPO at 86.)  While issue 3 mentions the "Court's equitable jurisdiction," it does not reference

the equitable remedy sought, such as specific performance, injunction, or an equitable lien.

Plaintiffs' opposition to the instant motion introduces the concept of an "equitable

decree" but does not elucidate the remedy they seek.  With respect to Section 502(a)(1)(B),

plaintiffs argue that their recovery:

> involves no more than the simple task of determining what amount
> of pension service time plaintiffs lost through violation of § 510,
> adding that service time to the time already recorded for their
> former service, and recalculating their pension benefits mutatis
> mutandis[5] under the plan formula.  It is a process that can easily be
> viewed as an illustration of the maxim that equity regards as done

---

[5]Mutatis Mutandis means "[a]ll the necessary changes having been made; with the
necessary changes."  Black's Law Dictionary 832 (7th ed. 2000).

8

what ought to be done.

(Opp. Br. at 5) (citations and internal quotation marks omitted, footnote added).  With regard to Section 502(a)(3), plaintiffs argue they seek "pay only in the sense that pensions were part of their total compensation, and a decree which remedies the denial of their right to continue earning pension credits up to the present time will serve essentially the same purpose as a conventional back pay award."  (Pl.'s Br. at 15.)  Plaintiffs further argue "any award for sums adjudged due as 'back pay' pension benefits will necessarily be ancillary to an equitable decree crediting plaintiffs with the additional service."  (Id. at 16.)

## III.   DISCUSSION

### A.      Summary Judgement Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  See Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989); Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987).  An issue is "genuine" if a reasonable factfinder could possibly hold in the nonmovant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A fact is material if it influences the outcome under the governing law.  Id. at 248.  At the summary judgment stage, a court may not weigh the evidence or make credibility findings; "these tasks are left for the fact-finder."  Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).  Therefore, to raise a genuine issue of material fact, "'the [summary judgment] opponent need not match, item for item, each piece of

evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard."  Id.; see also Anderson, 477 U.S. at 252 (holding "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").  In short, summary judgment is proper in the event that, even taking all factual disputes in a light most favorable to the plaintiff, relief could not be granted.

**B.    Plaintiffs' ERISA Claim**

Plaintiffs' claims are grounded in Section 510 of ERISA, 29 U.S.C. § 1140.  Section 510 provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

Section 502 is the civil enforcement provision of ERISA and provides certain remedies for the breach of ERISA sections such as 510.  29 U.S.C.A. § 1132.  Section 502 provides that a civil action may be brought:

> (1)  by a participant or beneficiary  . . . (B) to recover benefits due to him under the terms of his plan to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan;
>
> (2)  by the Secretary, or by a participant beneficiary or fiduciary for appropriate relief under section [409 of ERISA]; [and]
>
> (3)  by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of the subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this

subchapter or terms of the plan.

29 U.S.C. § 1132.  Plaintiffs seek recovery under Section 502(a)(1)(B) and Section 502(a)(3).

     **1.**       **ERISA Section 502(a)(1)(B),**

Defendants argue that Section 502(a)(1)(B) does not provide a remedy for plaintiffs' Section 510 claims because plaintiffs claim the Nets interfered with their ability to accrue benefits under the AT&T Plan, rather than a breach of the AT&T Plan itself.  (Def.'s Br. at 7.)  In opposition, plaintiffs argue that both legal and equitable relief, namely the recovery of pension benefits, enforcement of plan rights, and clarification of future benefits, are recoverable under Section 502(a)(1)(B).  (Pl.'s Opp. Br. at 3-8.)  For the following reasons, the Court holds that plaintiffs cannot recover under Section 502(a)(1)(B) as a matter of law.

Section 510 "is not concerned with whether a defendant complied with the contractual terms of an employee benefit plan.  Rather, the emphasis of a Section 510 action is to prevent persons and entities from taking actions which might cut off or interfere with a participant's ability to collect present or future benefits or which punish a participant for exercising his or her rights under an employee benefit plan."  Tolle v. Carroll Touch, Inc., 977 F.2d 1129, 1133 (7th Cir. 1992).  In this regard, the Court of Appeals for the Seventh Circuit has stated:

> In order to enforce the terms of a plan under Section 502, the participant must first qualify for the benefits provided in that plan. See 29 U.S.C. § 1132.  Rather than concerning itself with these qualifications, one of the actions which Section 510 makes unlawful is the interference with a participant's ability to meet these qualifications in the first instance.

Id. at 1134 (citations omitted).  Therefore, Section 510 is aimed at prohibiting interference with the rights of plan beneficiaries.  Section 502(a)(1)(B), on the other hand, provides a remedy for

the assertion of a contract right under an employee benefit plan.  Id. at 1133.  Thus, a violation of

Section 510 (prohibition of interference with the attainment of a right to which a participant

"may become entitled under a plan") is inconsistent with the remedy provided under Section

502(a)(1)(B) (recovery of benefits "due . . . under the terms of his plan").

The United States District Court for the Eastern District of New York drew the same

distinction in Russell v. Northrop Grumman Corp., 921 F. Supp. 143, 150 (E.D.N.Y. 1996).  In

Russell, the plaintiff sued his employer when he was fired just months shy of his twentieth

anniversary with the company, at which time he would have been entitled to 65% of his pension

once he reached age 50.  Id. at 146.  Plaintiff alleged that defendant terminated his employment

to interfere with his rights under the pension plan.  Id.  In dismissing plaintiff's claims under

ERISA Section 502(a)(1)(B), the Russell court noted that alleged violations of Section

502(a)(1)(B) "must be of the *terms* of the plan to be actionable."  Id. at 150 (emphasis in original)

(citations omitted).  Accordingly, the District Court held that the plaintiff could not recover under

Section 510, through Section 502(a)(1)(B), because he sought redress for interference with the

*entitlement* to benefits for which he had not yet qualified, and not *breach* of a term of the plan.

Id.

Defendants' alleged conduct here cannot form the basis for recovery under Section

502(a)(1)(B).  As in Russell, plaintiffs do not claim entitlement to relief already owed to them

under the Plan, but from interference with their ability to obtain benefits.  Specifically, plaintiffs

claim that the Nets "impede[d] their continued participation in the AT&T/Lucent pension plan,"

and that "such action constituted interference with the attainment of an ERISA-protected right."

(Pl.'s Br. at 2.)  Plaintiffs' attempt to recover money to which they would have been entitled but

12

for the Paradyne transfer appears to be the very remedy that the <u>Russell</u> court held is not

recoverable under Section 502(a)(1)(B).  For the reasons stated in that case, therefore, the Court

holds that plaintiffs cannot recover under Section 502(a)(1)(B) for a breach of Section 510.

      Plaintiffs argue that <u>Varity Corporation v. Howe</u>, 516 U.S. 489 (1996) supports their

claim under Section 502(a)(1)(B).  <u>Varity</u> held, in part, that plaintiffs who claimed a breach of

fiduciary duty under Section 409 of ERISA could not proceed under Section 502(a)(1)(B)

"because they were no longer members of the . . . plan and, therefore, had no 'benefits due

[them] under the terms of [the] plan.'"  516 U.S. at 515.  Plaintiffs argue this is a tacit

recognition that, had the plaintiffs in <u>Varity</u> been members of the plan, as plaintiffs in this case

are, they could have proceeded under Section 502(a)(1)(B).  (Pl. Br. at 7-8.)  The majority in

<u>Varity</u>, however, did not hold that a plaintiff alleging a violation of 510 can proceed under

Section 502(a)(1)(B) if they were plan participants, nor did the court address the propriety of

extra-contractual damages under Section 502(a)(1)(B).  Notably, the dissent in <u>Varity</u>, citing

prior Supreme Court precedent, stated as follows:

> Section 502(a)(1)(B) deals exclusively with contractual rights
> under the plan.  It allows a participant or beneficiary to bring a civil
> action "to recover benefits due to him under the terms of his plan,
> to enforce his rights under the terms of the plan, or to clarify his
> rights to future benefits under the terms of the plan."  As we
> recognized in <u>Russell</u>, this provision "says nothing about the
> recovery of extracontractual damages."

516 U.S. at 521 n.2 (Thomas, J., dissenting) (citing <u>Mass. Mut. Life Ins. v. Russell</u>, 473 U.S.

134, 144 (1985)).  Accordingly, this Court's previous analysis applies to plaintiffs' argument

under <u>Varity</u>.  Because plaintiffs seek damages for interference with their rights, not breach of

obligations under the AT&T Plan, Section 502(a)(1)(B) does not offer them a remedy.  The

Court does not read <u>Varity</u> to contradict this proposition.


>        **2.        ERISA Section 502(a)(3)**

Unlike the Court's analysis with respect to Section 502(a)(1)(B), the issue whether or not

plaintiffs may proceed under Section 502(a)(3) requires the Court to focus on the *type* of

damages sought.

Defendants characterize plaintiffs' alleged damages as "back pay." As such, they argue,

plaintiffs' damages are remedies at law and, therefore, not recoverable under Section 502(a)(3),

which allows only "appropriate equitable relief." (Def.'s Br. at 8-13.) Plaintiffs argue they are

seeking back pay "only in the sense that pensions were part of their total compensation, and a

decree which remedies the denial of their right to continue earning pension credits up to the

present time will serve essentially the same purpose as a conventional back pay award." (Pl.'s

Br. at 15.) For the reasons that follow, the Court holds that the relief plaintiffs seek is not

"appropriate *equitable* relief" under Section 502(a)(3).

As stated previously, ERISA Section 502(a)(3) allows recovery "to obtain other

appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this

subchapter or terms of the plan." 29 U.S.C. § 1132. Thus, recovery under Section 502(a)(3) is

limited to equitable relief. "Equitable relief" under Section 502(a)(3) means "those categories of

relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but

not compensatory damages)." <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 257 (1993). The

present motion requires the Court to determine whether or not the relief that plaintiffs seek is

"equitable" in nature and, therefore, recoverable under this section.

14

It is undeniable that plaintiffs seek money they claim is due as a result of the defendants' alleged wrongdoing.  Generally, such a recovery can only proceed under Section 502(a)(3) where (1) the damages are restitutionary in nature; or (2) where the back pay is incidental to a form of injunctive relief, such as reinstatement.  <u>Russell</u>, 921 F. Supp. at 153.  Plaintiffs' damages are neither.

### i.      Restitution

While "restitution" is among those remedies "typically available in equity," <u>Mertens</u>, 508 U.S. at 257, not all restitution constitutes "appropriate equitable relief" under Section 502(a)(3). In <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 524 U.S. 204 (2002) the Supreme Court distinguished between equitable restitution, which is recoverable under Section 502(a)(3), and legal restitution, which is not.  In that case, the plaintiff, the insurer of an ERISA plan, sued the wife of a plan participant who was involved in a car accident and recovered medical benefits from the plan.  534 U.S. at 207.  Plaintiff sought recovery under the reimbursement provision of the plan, for amounts the defendant recovered from a third-party in a tort action.  <u>Id.</u> at 207-08. Plaintiff argued the damages it sought were "equitable" under <u>Mertens</u> and, therefore, recoverable under Section 502(a)(3).  <u>Id.</u> at 210.  In rejecting Great-West's argument, the court reasoned as follows:

> In cases in which the plaintiff "could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution *at law* through an action derived from the common-law writ of assumpsit. 1 Dobbs § 4.2(1), at 571. <u>See</u> also Muir, *supra,* at 37.  In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of

money." Restatement of Restitution § 160, Comment *a,* pp. 641-642 (1936). Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

In contrast, a plaintiff could seek restitution *in equity,* ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. See 1 Dobbs § 4.3(1), at 587-588; Restatement of Restitution, *supra,* § 160, Comment *a,* at 641-642; 1 G. Palmer, Law of Restitution § 1.4, p. 17; § 3.7, p. 262 (1978). A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Restatement of Restitution, *supra,* § 215, Comment *a,* at 867. Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

Great-West, 534 U.S. at 213-14 (emphasis in original). With this standard in mind, the Court turns to plaintiffs' alleged damages.

Plaintiffs have expressly abandoned any claim to restitution. In their opposition brief, plaintiffs state that they "have no need for a theory of recovery grounded on 'restitution.'" because they seek "relief from conduct in violation not of a private contract but ERISA itself . . . ." (Pl.'s Br. at 15.) Accordingly, the Court need not reach the issue of whether or not plaintiffs' purported damages are the sort of restitution typically available in equity.

Had it reached the issue, however, the Court would hold that the relief that plaintiffs seek is not equitable in nature and, therefore, not recoverable under Section 502(a)(3). As a general

matter, the forced transfer of funds from the defendants to the plaintiffs "would not be a viable remedy because '[a]lmost invariably . . . suits seeking . . . to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of a legal duty.'"  Kishter v. Principal Life Ins. Co., 186 F. Supp. 2d 438, 445 (S.D.N.Y. 2002).  Plaintiffs do not seek recovery of money to which they are entitled, but rather recovery of benefits to which they would have been entitled had defendants not interfered with their rights. For example, in their Final Pretrial Order, plaintiffs preserve as a legal issue whether or not they have correctly calculated the monetary value of lost benefits due to defendants' "interference with their ability to continue holding pension-bearing employment up to the present time, or such sooner time as would have qualified them to receive pension benefits."  (FPO at 86.)  Moreover, in their Opposition Brief, plaintiffs claim that the Nets "impede[d] their continued participation in the AT&T/Lucent pension plan," and that "such action constituted interference with the attainment of an ERISA-protected right."  (Pl.'s Br. at 2.)  Thus, their recovery is not for the turn-over of a thing to which they are entitled, it is for the award of money damages.  This theory falls squarely within what the Great-West court held to be "restitution at law," 534 U.S. at 213, which is not recoverable under Section 502(a)(3).[6]

_____

[6]Nor have the plaintiffs argued that the remedy they seek amounts to an equitable lien or constructive trust.  See, e.g., Great-West, 534 U.S. at 213 (holding restitution in equity is recoverable under Section 502(a)(3) "ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.").  Thus, the Court need not decide whether or not the plaintiffs' alleged damages are sufficiently traceable to funds within the defendants' possession.  Compare Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 214 (3d Cir. 2004) (holding plaintiffs sufficiently identified the interest of wrongfully withheld funds so as to render it "readily traceable" under Great-West); with Horvath v.

ii.        **Incidental to Equitable Relief**

Plaintiffs argue that damages are recoverable under Section 502(a)(3) because they are an integral part of an equitable remedy.  (Opp. Br. at 16.)  Plaintiffs state this differently by arguing "any award for sums adjudged due as 'back pay' pension benefits will necessarily by ancillary to an equitable decree crediting plaintiffs with the additional service."  (Id.)  Defendants argue that plaintiffs' recasting their damages as the recovery of lost benefits still constitutes the type of compensatory relief that is not recoverable under Section 502(a)(3).  (Reply Br. at 10.)[7]

Plaintiffs rely on footnote 4 in the Great-West decision.  In that footnote, the majority rejected Justice Ginsburg's dissenting argument that Congress has treated back pay as a type of restitution and, therefore, "equitable" for the purpose of Title VII of the Civil Rights Act of 1964.  534 U.S. at 218 n.4; see also Strom v. Goldman Sacks & Co., 202 F.3d 138, 143-150 (2d Cir. 1999) (holding the recovery of life insurance proceeds that the plaintiff would have received but for defendants' breach of fiduciary duty, as with the National Labor Relations Act and Title VII, was a form of "equitable relief" under Section 502(a)(3)).  For this assertion, the dissent cited Curtis v. Loether, 415 U.S. 189, 197 (1974) and Teamsters v. Terry, 494 U.S. 558, 572 (1990).  The court reconciled this authority by stating, first, that "these cases do not say that since [the

───────────────

Keystone Health Plan East, 333 F.3d 450, 457 n.3 (3d Cir. 2003) (noting "there are no funds readily traceable to [plaintiff] over which a constructive trust or other equitable remedy may be imposed.").

[7]Defendants also argue that plaintiffs are "barred by the Court's Order of November 10, 2004" from "recharacteriz[ing] their damages as lost pension benefits."  (Reply Br. at 10.)  The Court's November 10, 2004 Order, however, reserved on the issue of "whether plaintiffs can quantify or establish any right to 'back pay' and/or equitable relief increasing plaintiff's pension benefits."  [Docket Entry No. 163] (emphasis added).  It appears, therefore, plaintiffs are not barred from at least arguing their damages are equitable in nature.

remedy sought] is restitutionary, it is *therefore* equitable."  534 U.S. at 218 n.4 (emphasis in

original).  The majority further noted that Congress had treated back pay as equitable relief in

Title VII cases only in the narrow sense that it allowed back pay to be awarded "together with

equitable relief."  534 U.S. at 218 n.4. (quoting 42 U.S.C. § 2000e-5(g)(1), which expressly

permits a court to order "affirmative action as may be appropriate, which may include, but is not

limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other

equitable relief as the court deems appropriate.").  The majority stated this language can only be

"understood to mean that Title VII backpay was 'specifically' made part of an equitable remedy."

Id.  The majority concluded that the remedy sought by Great-West – namely the reimbursement

of medical benefits in the amount the beneficiary's tort recovery from a third-party – was "a

freestanding claim for money damages" and "Title VII has nothing to do with the case."  Id.[8]

 First, the plaintiffs have not preserved their right to the "equitable decree" that they now

purport to seek.  Rather, with respect to damages, plaintiffs stated they will call 25 former

Paradyne employees whose testimony "will correspond closely to information provided in

depositions and responses to written discovery requests, the answers to interrogatories

propounded by defendants . . . near the end of 2004 in particular."  (Id. at 30.)  The interrogatory

responses to which the Final Pretrial Order refers reflect compensatory damages in the amount

that plaintiffs claim they have lost because of defendants' conduct.  (See, e.g., Fabian Cert., Ex.

H at 6-7.)  The responses do not state that the plaintiffs seek equitable relief, but rather frame

their damages solely in terms of a monetary amount.  In Mertens, the Supreme Court excluded

---

[8]In Kishter v. Principal Life Insurance Co., the United States District Court for the
Southern District of New York recognized that "the Second Circuit's reasoning in Strom has
been superseded by Great-West . . . ."  186 F. Supp. 2d at 445.

19

such compensatory damages from those recoverable as "appropriate equitable relief" under

Section 503(a)(3).  508 U.S. at 257 (holding "equitable relief" under Section 502(a)(3) is limited

to "those categories of relief that were *typically* available in equity (such as injunction,

mandamus, and restitution, <u>but not compensatory damages</u>)." (emphasis added)); <u>see</u> <u>also</u>

<u>Kishter</u>, 186 F. Supp. 2d at 438.

      Second, even if plaintiffs preserved their right to appropriate equitable relief under

Section 502(a)(3), footnote 4 of the <u>Great-West</u> opinion does not support their claim.  Indeed, the

majority stated that the dissent's argument by analogy could only be given credence if Title VII

expressly included back pay as equitable relief as a matter of statute.  534 U.S. at 218 n.4.

Contrary to 42 U.S.C. § 2000e-5(g)(1), Section 502(a)(3) makes no mention of "back pay" and

certainly does not specifically make it part of an equitable remedy.  Plaintiffs cite no other legal

authority for their argument that their claim to back pay and benefits are recoverable under

Section 502(a)(3) because they are ancillary to an equitable decree.  Indeed, the weight of legal

authority would prohibit plaintiffs from recovering the damages they seek.  See <u>Nicolau v.</u>

<u>Horizon Media, Ins.</u>, No. 01 CIV. 0785, 2003 WL 22208356, at *3 (S.D.N.Y Sept. 23, 2003)

(dismissing plaintiffs' claim for lost wages and other money damages, where plaintiffs did not

seek reinstatement or any other form of equitable relief, "[b]ecause neither lost wages nor other

money damages constitute an equitable remedy . . . ."), <u>reh'g</u> <u>granted</u> 2003 WL 22852680

(S.D.N.Y. Oct. 15, 2003), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 402 F.3d 325 (2d Cir. 2005); <u>Pace v.</u>

<u>Matsushita Elec. Corp. of America</u>, 257 F. Supp. 2d 543, 563 (E.D.N.Y. 2003) (holding the

Great-West decision abrogated <u>Strom's</u> "'make-whole' remedial scheme."); <u>Bona v. Barasch</u>,

No. 01-civ-2289, 2003 WL 1395932, at *12 (S.D.N.Y. March 20, 2003) (holding since the

plaintiffs' "claim for monetary relief is nothing more than a claim for money damages as compensation for losses," they were barred from recovery under Section 503(a)(3)); Kishter, 186 F. Supp. 2d at 438.  Given this authority, and the absence of authority supporting plaintiffs' recovery, the Court holds that plaintiffs' purported damages, as described in their brief and answers to interrogatories, are not recoverable under Section 502(a)(3).

Third, the plaintiffs' efforts to cloak their damages in the garb of an "equitable decree" does not advance their argument.  In Great-West, the Supreme Court held that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity."  534 U.S. at 210-11.  While plaintiffs disclaim any resort to equitable relief, their purported "equitable decree" is on all fours with the type of "legal restitution" that the Great-West case held was not recoverable under Section 502(a)(3).  Thus, plaintiffs' calling the award of back pay-type damages an equitable decree will not save their claim.  See id. at 255 (holding "[a]lthough they often dance around the word, what petitioners in fact seek is nothing other than compensatory *damages* . . . ").  In short, given that the only remedies available under Section 502(a)(3) are those "typically available in equity," Mertens, 508 U.S. at 257, plaintiffs cannot be heard to seek the forced transfer of money.

Finally, plaintiffs distinguish their claims from those of the plan in Great-West in that plaintiffs seek recovery for a violation of ERISA itself, "not of a private contract."  (Pl.'s Br. at 15.)  Section 503(a)(3) provides that a civil action may be brought "by a participant, beneficiary, or fiduciary . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or terms of the plan."  29 U.S.C. § 1132 (emphasis added).  This section makes no distinction between remedies for violation of ERISA and

remedies for violation of the terms of a plan. Even if plaintiffs' argument were given credence, however, they cite no legal authority for the proposition that breach of ERISA, presumably Section 510, rather than a breach of the terms of a plan, converts their alleged damages into an "appropriate equitable remedy" under Section 502(a)(3). Therefore, the Court finds this argument unpersuasive.

## III.    CONCLUSION

For all of these reasons, the Court grants defendants' motion for summary judgment. An appropriate Order will follow.


November 22, 2005


                                                          s/Stanley R. Chesler_____
                                                          United States District Judge